Would the two lawyers who are going to address the court please each stand and just give us and spell your names. Good morning, Your Honor. Joshua Vinson on behalf of the defendant, Chicago Board of Education, and that's J-O-S-H-U-A-V-I-N-C-E-N-T. Good morning, Your Honor. This is Michael Raschak. I'm here on behalf of the plaintiff at belief, Pamela Young, the administrator for the estate of Tyrone Lawson, M-I-C-H-A-E-L-R-A-T-H-S-A-C-K. Thank you, gentlemen. Mr. Vinson, whenever you're ready, you may proceed. Mr. Raschak, you may sit down. You have 20 minutes. Mr. Vinson, would you like to preserve any of that for rebuttal? Sure. Five minutes, please. Thank you, Your Honor. When you consider all the cases that parties have cited in their briefs here, there's a pattern that emerges, a decision tree, if you will, in the cases that you can see. And they always start out with the statement of the general rule of non-liability for criminal acts of third parties. And then, you know, once they've stated the general rule, they look at whether there was a special relationship from which you could somehow create a duty. By a voluntary undertaking, perhaps? That's the next one. Once they find that there maybe wasn't a special relationship, the next step is the court looks for voluntary undertaking. And then, if you find a voluntary undertaking or a duty under those circumstances in the cases involving units of local government, public entities, then we look at whether there's any immunities that are required. But first we look at whether there's a duty, right? So let's... Yeah. Because I don't think there's really any serious contention here that there was a special relationship between the school and Tyrone. And so a lot of the duty in this case seems to be revolving around the plaintiff's contention that Principal Edwards' letter represented a voluntary undertaking. And holding the game and, you know, there was more to it than just the letter. Well, the plaintiff was focused on the letter. Okay. Because the letter actually contained a statement in it about an event, an incident that had occurred at Gately Stadium at a football game in September, the year before this incident. And explained that there had been a disturbance, there had been basically a panicked crowd in the stands at Gately Stadium that ran out, a few people were injured, and that he had reached out. A letter to parents, had reached out to the parents to tell them that... I don't want to stop you, but there are really complicated questions here on immunity and I think the general verdict rule. Okay. I don't think that duty, even though you spend a good deal of your brief on it, is necessarily the hard question here. I think there's... I'd like you to not spend too much of your argument on that. I'd like you to move on to what I consider the harder questions. Sure. I mean, our position is, just to be clear, that that letter, and that there was no duty, and I do want to emphasize the fact that, of what happened here from a foreseeability standpoint, because there was absolutely nothing, absolutely nothing, that could have predicted a random act of gang-related violence. And so from the standpoint of duty, I do think that that is a critical question in this case. And virtually every case that goes through the decision tree that I just explained does squarely address that question and recognizes that when you have a random act of violence like that, that is totally unforeseeable. And there's absolutely nothing here, either at the football game, in the description of prior acts of violence that allegedly had occurred at other sporting events, that had any relationship whatsoever to the incident that occurred at the basketball game in this case. But with that said, if the court feels that somehow there is a duty created here, then you do come to the question of whether there's an immunity that applies. And we do feel that the 4-102 immunity for the failure to provide adequate police protection encompasses this entire case. And I say that because, specifically, when you look at the issues instruction in this case, and this was covered to some extent in the supplemental briefing that the court asked for, five of the six issues that were submitted to the jury, the specific ones that asked whether the board had engaged in willful and wanton conduct in one or more of the following ways, the first five all deal specifically with the failure to implement a security plan. That all goes by failing to have maintained posts within the arena, keeping entrances and exits clear of crowds, allowing fans to engage in multiple fights, safety of students, prevent fans from exiting the arena in a disorderly manner. Every single one of those first five issues all revolves entirely around the adequacy of the security and the police protection service. And how about the failure to communicate? The failure to communicate one, I also believe, falls squarely within 4-102. And I think the case that's really dispositive of that issue is Dismet. You know, in the Dismet versus County of Rock Island case, you had an almost identical sort of situation. You know, a woman's driving down a country road. She sees somebody go by at an extraordinarily high rate of speed. Goes off the road, crashes into a ditch. She calls the county authorities and says, hey, I just saw this bad accident. Someone fined me an extremely high rate of speed crash. You better send somebody to investigate. And what happens? The county authority calls the other county, calls Rock Island County, to communicate the information that they had just received about that report. And what happens? They even quote the exchange between the two authorities in the opinion, and you see that there's a complete absence of detail as to what occurred. The one county authority didn't tell the other county authority really any of the details that had been explained. It was just a car went off the road. And as a result, the responding county, Rock Island County, didn't do anything. They didn't go out and investigate and say, yeah, we'll check into it. And they didn't treat it as the emergency that it actually was. Why? Because insufficient information had been communicated from one county to the next. And sure enough, what happens? The person who was injured, their family reports them missing. The authorities go out finally and look for her. A day or two later, they find her in the ditch, dead. All could have been avoided if the information had been supplied. That's the adequacy of the police protection. And what did the court find? The court specifically found that the county was immune under 4-102 for its failure to provide adequate information about the emergency and the circumstances that would have led to intervention by the other county. And that's really, I think, almost a perfect parallel here with regard to what has alleged to have happened between the school board and the CSU police. How about the letter to the parents? Well, the letter to the parents doesn't contain – I mean, that's going back to the duty question. I mean, the letter to the parents is not a freestanding theory of liability in this case. You know, when you look at the issues instruction, the jury wasn't instructed on the letter. That wasn't one of the things they were asked to decide. I mean, there's certainly evidence about it. I don't deny that, but it really only goes to the duty question. I mean, that's all the letter really stands for. So from the standpoint of – Duty to do what? Well, the letter says that they would modify security plans. Modifications to security plans had been made in order to maintain a safe environment during sporting events. Yeah, that's what it says, but in what way does it go to the duty question? What does that have to do with duty? Well, as I interpret the plaintiff's position, that was a voluntary undertaking to improve the level of security at sporting events to avoid incidents similar to what had happened at Gately Stadium where there was a disturbance in a crowd pact. And that's why I started out being very focused on the letter because I really think that's all the letter has to do with in this case is duty. Like I said, it's not a freestanding theory of liability. It may have been part of the complaint, no question about it. There was evidence brought in about it. But the jury was not instructed on anything, any theory that emanates from the letter. The jury was instructed that there was inadequate security in this case. And the reason the jury was instructed to decide whether there was inadequate security was because plaintiffs claimed a promise had been made, a voluntary undertaking, to provide better security than had been experienced at Gately Stadium four months earlier. So that to me is the only significance the letter has. And as I said, the letter doesn't involve a situation remotely similar to the situation at CSU where this basketball game was played. It was confined to Gately Stadium, a very small venue. It was confined to a disturbance in the stands. There's no representation in this letter that the school district or the sports administration is going to go out and secure areas outside the school grounds to try and prevent crime from occurring. Is it accurate that the other part of that letter was the theory that the board failed to communicate the contents or gist of that letter to CSU so that absence, that failure to notify them of a potential volatile situation caused the circumstances to exist? Yes, that is part of the theory. Was that part of the police security provision? Yes, because the testimony that was given in that context, at least by the CSU officers, was yes. We would have wanted to have known about the prior incident at the football stadium. We would have wanted to know about the prior acts of violence that were mentioned in an e-mail that Director Davis had sent after this event, mentioning there had been prior acts of violence. Again, no description of what that violence was. And again, the incident at the football stadium being something, not a random act of gang violence, and neither were the prior acts of violence, which really went, I mean, the only testimony about what the prior acts of violence was was that there were scuffles. I mean, we've all been to high school games when we were in high school, and there were always fights here and there and scuffles here and there and rivalries. But a situation where a 37-year-old man shows up at the game, drops his daughter off 15 minutes before the game ends, and then goes out in the parking lot and shoots a young man to death based on a gang rivalry at a terror town between two different age groups of the gangster disciples. I mean, this is about as freakish and bizarre as you can imagine. I mean, trying to hold the Chicago Board of Education responsible for not preventing something like this is asking them to do what the Chicago Police Department and federal law enforcement authorities here in our city have been unable to accomplish for years, and that's anticipate and prevent random acts of gang-related violence. And so while, you know, it goes without saying that this was an enormously tragic event, there's really no evidence in this case as to, A, how it could have been prevented, but, B, that it was at all reasonably foreseeable to the school. The incident at the football game, that's not any kind of unique knowledge, specific knowledge, that this Mike McNabb fellow would show up with a gun and shoot Tyrone to death, that there would be a gang outburst like this. The prior acts of violence, there was nothing gang-related, you know, about the scuffles that occurred at games from time to time, none of that. And in the instances where you see liability imposed, which is rare in these cases, there's usually specific knowledge about a specific danger that somebody was aware of and the courts found you should have anticipated that this type of thing really could happen. And there was no evidence that would have led to that conclusion in this particular case. So the board's position is that the only basis on which a verdict was rendered was on the issue of security. That's what the whole case was about. I mean, when you read, I mean, you look at the evidence, what did they talk about? And, again, I'm very focused on the issues instruction because that defines very clearly what it was the jury was called upon to decide. And every single one of these connects directly to the issue of the adequacy of the security and the failure to prevent a crime. I mean, the first five, as I said, all deal very specifically with the security plan and its adequacy. Did we prevent fights? Did we prevent frauds? Did we prevent loitering? Whatever it might be. Crowd control. Those are all security aspects. Now, you know, the thing that's, I think, kind of remarkable about this case, and I have to tip my hat to the skill of the trial lawyers who handled it for the plaintiff, in their ability to have taken circumstances that occurred inside the arena that had absolutely no connection to what happened out in that parking lot. I mean, the fact that there was a scuffle here and a scuffle there, a fight, many of which were unfounded. But when you watch how this trial unfolded and you read that transcript, you see that there was a very carefully crafted approach to isolate using, you know, the dispatcher from CSU talking about this and we've got to call him this, we've got to call him that, we investigated this, we investigated that, there's a crowd over here, there's people walking through the woods, to develop this image in the minds of the jurors, this atmosphere, that there was pandemonium going on at this game, when, in fact, there was no evidence of that. The only testimony about any issues at the game in terms of chaos or something of that sort was after the shooting had occurred. And that comes from the testimony of the paramedic who showed up almost half an hour after the shooting occurred. He's the only one who says, it was crazy. But there's no other testimony about that. Every single other person who testified said, it was orderly, it was fine, you can see the video. There's no chaos depicted on that video in the parking lot. So, you know, there was this atmosphere created in the courtroom by how this case was presented to suggest that somehow this was, you know, an out-of-control situation and Mr. Rancic, you know, takes advantage of that in his brief to say, well, you know, maybe that's why Mr. McNabb felt he could get away with doing something like this, but that is not really, there's no connection at all that's made in this case between the slight incidents that happened in the arena and this shooting that took place outside. They're just completely disconnected. You're technically out of time, but I have one more question and the other panel may too. Would you please, if we disagree with you that every part of this is connected, is protected by immunity, every theory on which the plaintiff's case rested, what's your response to the general verdict statute? You say, well, it's unfair, but you don't cite any law that suggests that if there's any theory that it's not legally unsound. Well, I can only go by the theories that are stated in the issues instruction. Okay, so one of them is failure to communicate prior acts of violence at court events. That's right. And you say that's police protective services. And you argue in your brief it's also provision of information. That's absolutely correct. But if we were to disagree with you on both of these. Well, then the issue becomes, as we submitted in our supplemental brief, it becomes an issue of proximate cause. I mean, there was no evidence either from plaintiff's expert or from the CSU police as to what they would have done differently. You know, proximate cause involves both but-for causation, cause and fact. They would have to show what would have been done differently in the event they had this information and that it would have made a difference. And there's also legal cause. So we're back to the foreseeability question. Had you had this information, there was evidence that it would have made a difference because they said that it would have made a difference had they had the information. And if the jury based its verdict on the failure to communicate, explain how do you get around the general verdict rule if there was a basis for the jury verdict in the first place. They didn't say what they would have done differently. They said they would have liked to have had that information. And they would have been able to do things differently. But they couldn't say what. And that's critical. I mean, in a case like this, you know, how is the jury going to decide that question of what could have been done differently to prevent the shooting? That's why there was expert testimony in this case. Expert testimony on security planning and the implementation of security. A jury is not in a position to guess what it is the CSU police would have done differently if they had had this information. So just the statement that, well, we would have done something differently, that's not enough. You need to know what it's going to be. And there's plenty of case law in this state, and we've cited that in our brief, most of the cases that we relied upon in medical malpractice cases. But, again, it's the same principle. It's a question of expert testimony because those sorts of issues, medicine just like security, is not something within the ken of the average juror. And so in order for the plaintiff to establish proximate cause in this case, and right now we're really only talking about but-for causation, we're not talking about, I mean, there's still the question of legal cause, whether this incident, whether it was foreseeable, legally foreseeable, that the failure to have that information would result in an incident like this. Okay, so if you didn't have the information about a football incident or some random prior acts of violence involving scuffles at other games, does that make it foreseeable from a legal cause standpoint that there would be a random act of gang-related violence based on a rivalry from a neighborhood? No. So it fails on the proximate cause level on both aspects, but-for because you don't have either the expert testimony or testimony from the CSU police as to what they would have done differently. In the medical malpractice case, if the doctor says, I would have done something differently had I known this information from the nurse, you've established the proximate cause. But if you can't say what the treatment would have been had you known the information, and that's the missing element here, and that was the basis of the motion for directed verdict in this case, that issue never should have gone to the jury. That issue does fail for that reason alone. And that's in response to your question, Justice Ginsburg. So your general answer to the general verdict rule is that none of these theories really should have ever gone to the jury? Well, I certainly think that the first five, I think all of them were barred by 4-102. Yes, there's no question about that. In fact, when you look at most of the cases that are cited in the briefs, I don't think there's any that went to verdict. I mean, they're all out on summary judgment or reversed on summary judgment sent back, but we never see what happens at the trial. So, you know, this is kind of a little bit of an interesting posture here that you have the full breadth of the evidence in this case. And, yes, I think that that's all the evidence was about was the adequacy of security. That's what this whole case was based on. So, for those reasons, we would ask you to vacate this judgment and grant J.N.O.V. to the board, please. Justice Pierce, do you have a question? No. Thank you. We'll see you again in a little while. Good morning, Your Honor. As I said, Michael Rasack. I'm here on behalf of the Plaintiff's Affiliate, Pamela Young. The argument seemed to move rather quickly to a question of proximate cause rather than the duty issues that I had intended to discuss. I would object to the proximate cause argument here because if we look through the defendant's post-trial motion, they do not raise the question in the post-trial motion about there not being proximate cause. That's not the issue they addressed. The issue addressed were the various issues addressed were the various immunity issues. And if we look at the proximate cause, I can deal with it very quickly. Mr. Bondy at 1128 said that what they should have done was prioritize the protection in the lot where the gun was flashed. And Sharon Robinson, I believe is her name, said we have levels of security. We should have known about these other incidents because we have levels of security. She didn't specifically say we would have changed the levels of security, but the jury, when they heard that, surely knew she did not mean if there were more threats, we would have dropped the level of security. We surely would have raised the level of security. And Mr. Jacobs, their expert, talked about we had enough people out there, and I think the jurors could infer, well, if he thought there was enough, then the implication was there should have been more from the other side. I thought that was pretty clear. Moving, if I can, to the immunity issues, counsel relied on the DeSmet case when we talk about whether the letter and the failure of the board to communicate the acts of violence and the September football game problems to the CSU. DeSmet involved really a direct, and I think that's why I lost it, frankly. It involved one act. Now, there was a series of acts spread over a couple of days, but it was really one act of police enforcement, and that was the problem with that case. I was trying to think of an analogy, frankly, as I sat there, and the analogy might be if we allege that somehow one of the officers here didn't answer the other call that Robinson, I think, was the one who put out or Norrie put out that we have a problem with the fight. You would then have one ongoing criminal act, and it would be hard to distinguish what was going on and call one part police protection and the other part not police protection. In this case, what they're trying to call police protection are two things. The letter that the board, Mr. Edwards was really the conduit, as I understand it. I don't know that he made the decision. It sure didn't sound like he made the decision. He said the board has decided, and that goes to the question of whether or not he was providing information or exercising discretion as well. Mr. Edwards said the board decided to fix this. You will be okay. Now, what about Mr. Vinson's suggestion that that was never a theory that was presented to the jury for liability, the letter to the parents? Is that true or not true? I don't usually have to shuffle papers, but as Mr. Vinson hinted, there's a lot of issues in this case. In the very beginning of the brief, the introductory paragraph, the defense basically says that these are all the same issue. That's in the very first paragraph. It's all wrapped together as one issue, these failures to communicate. And the jury, despite the peculiar words that are used in the issues instruction, if we look at the closing argument, the closing argument by everybody is nothing more than the letter, the neutral game site announcement, the fact that Davis did not tell the CSU about the prior acts of violence and the fact that Davis and nobody else on the board told the Chicago State University CSU about the September football game problems, things that everybody on the witness stand said would have mattered. So how does the whole defense of the CSU deal with it? We need to know that stuff. That's all the jury heard. I read it before I came to make sure I was not misinforming the court. That was what the case was about. The jury, no one attacked the sufficiency of the issues instruction. I don't believe anybody even objected to that. They don't think we proved our case. So did that relate to police protection or security, or did that relate to communication? And I think that's the question we had before this court. I mean, was this letter? So guide us. And the problem, and I think someone mentioned, we don't have a case that I am aware or that counsel is aware of that looks just like this one. We have something like this now where it's basically one action. We know that there's a duty. The McKinney case shows that there can just generally be a duty if we weren't talking toward immunities, if you don't provide information that the security people need. Our position is that first we look at the letter. The letter greatly, by a great period of time, precedes this incident. It's a general announcement from the board. Our position is that that is just too far removed from what you think of as a police function. And one of the reasons I say that is if we look at a corollary part of the Tort Immunity Act, Section 2-202, which provides immunity for enforcing the law. And when the courts have looked at that, enforcing the law, because it's a restriction on the common law, they've really interpreted or construed that section of the Tort Immunity Act very narrowly. I think the example in the case I cited was transporting prisoners, not enforcing the law. All we're asking the court to do is to take the same look at this, that the incidents that we're talking about that trigger the problems down the road are not really police enforcement. So what are they? I would say they voluntarily undertook a duty by telling the parents not to worry. The duty to do what? Not to worry? No, I agree. I've struggled with this. We've both struggled with it. If I send a letter to the parents, what I'm doing is telling them that it will be okay. Inevitably, that almost leads me to the statement, well, to be okay means we have to provide security. But our point is there is a disconnect between... Counsel has been saying that it was a duty to take on a voluntary undertaking. That's what counsel argued. And that was your argument. So is that still your argument? It is. Our argument is that each of the three things became a voluntary undertaking. And I guess the question is are we asking the court to say that there was a voluntary undertaking to provide a police duty? I'm sorry, to provide police protection. So there was a voluntary undertaking in which they failed. That's correct. And the voluntary undertaking was to make this a safe event. Does that necessarily bring into play... Exactly. And we believe that is separate from the question of police protection. Inevitably, I have to admit, you can draw lines between all of these points. I'm not saying you can't. But to sustain your verdict, don't. Tell us why your verdict should stand if this relates to providing security. Because I think an argument can be made that under the Tort Immunity Act, the governmental agency has no obligation to provide security. Correct. And if it does provide security and it's inadequate, it is still immune from liability. So if that's a correct statement of the law in my language terms, then your argument seems to be that they voluntarily assumed a duty to provide a safe environment for this game, which is security, and under the Tort Immunity Act, they didn't have to do that. But they did, but they're still immune. And I think we're... That's where I agree. I appreciate that. They agreed to make it a safe event. I don't know that the court has to make the leap to collect a safe event to security. You can do that. But is that what the voluntary undertaking is about? And is that what the Tort Immunity Act means to reach out so far beyond the event itself? They're asking the court to look at simply the event being a half hour before the shooting. We're looking at way beyond that. The example that I used in my brief, I thought, was what if a car cannot... That means the police officer couldn't go out on call. Is that going to fall under 4-102? I would argue not because it's too far removed. There's no direct connection between his conduct, the officer not providing the security, on call. So you're agreeing, it sounds like, or potentially conceding that some of the theories that went to the jury, like not assigning and maintaining posts within the arena, which is right there, right there, that could perhaps be within police protective services. I'm not going to fight with the obvious. I try not to do that. And I cap that by saying what I started with, which is despite what you can read the issues, that's not what the jury heard, and that's not what this case went to trial, and it's not really what we have argued on appeal. What we argued on appeal were the duty questions. And what you seem to have argued on appeal or focused on on appeal is the letter to the parents and the provision of information to CSU. Exactly. Or more accurately, the failure to provide information to CSU because it's critical to our other court immunity arguments, you know, the provision of information and policy and discretion. Well, why wouldn't that immunity apply? If the information is supplied by the entity, the board, or the failure to provide information, isn't that enjoy complete immunity? No, because the provision of information section only talks about affirmative acts, misrepresentation. That might conceivably cover the Edwards letter, and I would argue it doesn't, but it would not cover the failure to tell them. It does not. That section of the Court of Immunity Act talking about negligent misrepresentation doesn't apply to not telling somebody something. And what we have here is I'm not telling somebody something, an omission rather than a commission. So if the Edwards letter would arguably fall under the 107, you know, the providing of information, 110 because he was an employee, 107 would not apply in your argument, in your view, because it only deals with affirmative provisions, not omissions. Exactly. It also deals with negligent misrepresentation, and the board, I mean, the jury found that the board was lawful in line here. Not in 107. No, I'm sorry. And that's the distinction. Those two sections were obviously not crafted by one person who was trying to make them consistent. It's almost impossible to make. I think it's impossible to make them consistent. One of them applies to the entity, and one of them applies to the employee. Right, right. But if what Your Honor says is correct, there would then create a situation where the employee is not immune because but the employee is immune, but the employer is not immune. No, it's the opposite. 110 says the employee is immune for negligent misrepresentation. Hold it. Okay. But if he acts willful and wantonly, the employee can be labeled. Correct. Right. But if you go then and say, well, what about the employer? The employer, 107 says, doesn't matter. Not at all. Not at all. I think that's what I just said. I think that's what I just said. You had a situation where the legislature, we have to say the legislature intended that the employee, under the right circumstance, could be liable for this judgment, but the employer would not be. I find it hard to believe, and no one has a case on point, because I've never seen a statute where they have two parts that are so related to each other that has that distinction. But the question is whether or not you're providing information. What Mr. Edwards was providing, he was passing on a pronouncement by the board. Our position, he wasn't really providing information. He was saying, it wasn't the employer giving information. I'm not standing at the corner saying your building plot is okay, you can build your fence. This is an official pronouncement. But you're saying that Edwards was acting on behalf of the board, right? Yes. He was transmitting at the board. Yes. Yes. So it was the board's act telling the parents that it's going to be a safe environment. Correct. But 107 says, if it's the board acting, it's not liable. If it's the board providing information, not if the board is not acting. Well, how else would the board provide information in this case other than through Mr. Edwards? And what I'm suggesting is that when the board makes a pronouncement, it's not really providing information. They're basically just telling the parents, this is what we did. I would disagree that that's providing information. I think there's a distinction that can be drawn there. Otherwise, you have just given everybody complete 100% blanket immunity. That does not strike me, and I don't think it would strike most people, as being a strict interpretation of the Tort Immunity Act, which is what I'm relying upon here on part is that your duty is this much, and the Tort Immunity Act is here. That would be part of our point. I think it's different. So the letter in itself was not the providing of information. It was a statement of fact? It was really a transmission of the information from the board. The letter just says the principal didn't say, I'm telling you this. Let's assume that it's the act of the board through Mr. Edwards. Okay, that's a given. If it's information, then arguably 107 kicks in. If it's not information, then arguably 107 does not apply. Correct. And that would be enough to sustain this verdict? Yes, because now they're not providing information. If the pronouncement by the board that we will do X is not providing information, then the immunity doesn't apply. Keeping in mind that they've got three separate points here, and they have to escape each one. The letter, the football game in September, the terrible incidents there, and what Mr. Davis called violent acts in the two weeks preceding this, something he tried desperately to back away from at trial by minimizing them, but his email is there. I have two questions. I'll start with the first one. In your brief, you seem to have argued, and you seem to be backing away from it, which I appreciate, that somehow if there's a duty or a special relationship, the immunities don't apply. I would ask the court to consider that, but clearly the court would have to go out on a separate path to do it. And disagree with the Supreme Court and things like that. You would have to disagree with other courts. I agree with that. If the immunity applies, it's going to trump everything. I think it should. We argued as best we could, but the case law is there. The court would have to disagree with the case law that's already there. I appreciate that. Here is something that I think is less clear, and you've also, I think, written on this. I happen to have read your article on the general verdict rule. So you are well versed in that, I believe. And I'm wondering if you are familiar with the recent decision of this court. If you give me a minute, I can lay my hands on it. It basically says it's Inman v. Howell Freightways. Are you familiar with that? I don't remember the facts. The facts are, it's 100 pages, so it doesn't really matter what the facts are. The point is that the Justice makes there is when there's, I guess, here's the question. What else could the city have done to protect themselves when they think, and you almost not quite concede that 80%, 90% of the theories were protected from immunity, but there's perhaps these other theories that aren't. What could the board have done that they didn't do to protect themselves? The courts, other than Inman, I think, if I'm pronouncing it right, said that you have to file a special interrogatory and ask the jury specific questions. But they tried to do that. I have two responses to that. They didn't preserve that issue because the post-trial motion doesn't say anything. I would basically have meant we should have had these there right, and they're both wrong. But also the interrogatories that they did attempt to file would not have answered all the questions. Exactly. The answer to the first interrogatory especially would not have been inconsistent for the reasons I tried to set out in detail in my brief. So if they were supposed to do it, they did not do it the right way. If they had done it the right way, the trial judge seemed to listen to everybody. As the court was aware from reading the record, there was a lot of argument that went on in this case. I can't predict what would happen, but that's what the rule is. And I know my article says, I'm well aware of what my article says because I've had it cited back to me more than once in my career since, and even by my co-authors in the case. But it is the law, and it should be applicable here. If they didn't do what they needed to do. And what they needed to do, just to have, what is it that they needed to do? They would have had to have a series of special interrogatories that specifically dealt with all the things we're talking about here. It would have been difficult, but it could have been done. That tried to pin down exactly what theories were. Why did the jury come back? Keeping in mind what the jury heard in the argument, despite what we've heard today, that closing argument by everybody, including the board, including the CSU, doesn't really square up with some of the issues that the jury had. I'm well aware of that. But that's never been an issue in this case. Nobody said that we went outside the scope of the issues to the jury. That first popped up when we started talking about the supplemental briefs. It got the oral argument. That's kind of shifty quicksand underneath me on that one. We tend to do that. Unless I'm well beyond my time, unless the court has further questions. Do you have anything else you want to say? I have nothing but time. I do not. Unless the court has some questions for me, hopefully we made our position clear on the other points in the rest of our briefing, we would rely upon that. We're well aware, both counsel are well aware, that the court takes our brief seriously, and we appreciate that. Thank you. Thank you, counsel. I'm back. You're back. I'll try to take this in kind of the order in which I made my notes as I listened to the colloquy between the court and Mr. Rasek. With respect to the proximate cause issue and the testimony of the expert about prioritizing protection, obviously for starters that's inadequacy. I'm sorry, for starters. That's an adequacy of protection issue, so that does go to 4-102. But from a proximate cause standpoint, I think you have to keep in mind that what the expert was talking about at that point was what to do after they found out about the brandishing of the firearm. What do you do? Now, that has nothing to do with the information that wasn't communicated. Because at that moment, you've got to keep the timeline in place here. And in this timeline, you've got to remember, there's the events that may have happened before and you didn't provide enough adequate protection because of what we wish you would have told us, theory. But then the expert is saying, well, you should have posted someone, you should have prioritized the protection in that parking lot. That's only after we had the brandishing of the firearm, which the information that the board allegedly didn't provide to CSU has nothing to do with. What about Mr. Rasek's suggestion that you forfeited this issue? Oh, well, certainly. Wasn't I getting your push from this? Well, it was argued in the motion for directed verdict. And I think that's all that's necessary for purposes of the general verdict rule that's right in 2-1201, is that as long as you have asserted that there was insufficient evidence to support the submission of that issue to the jury, then you've preserved it. And that's exactly what happened here. That argument was made during the motions for directed verdict, and we spelled that out in our supplemental brief. So, I mean, obviously the board joined in the argument that CSU made on that, but I think we all know as a matter of trial practice that's for purposes of expediency happens all the time. So the argument was made. I think that's accurately preserved. I'm not sure I understood the argument about the disment case and the attempt to distinguish it. I think the focus there is on temporal connection to what occurred. I don't want to speak for Mr. Ravchack. He speaks fine for himself. But, you know, the few things that we're talking about as potentially outside of police protected services occurred long before the murder of the plaintiff in this case. But that's kind of talking out of both sides of your mouth, because on the one hand you can't say it was too long ago when you said you were going to give us better protection, but you should be held liable now because you said you were going to give us better protection. I mean, they're relying on the letter that said we promised you better protection as the basis for the duty in this case, but yet they want to say, well, you made that statement so long ago, it doesn't have anything to do with the accuracy of the security. That's, to me, that's inherently contradictory. So I don't think that flies. I mean, you have to help us here because partly, and I think the courts, I think we've all read enough of these cases to see the courts are struggling with this, but how do you draw these lines in this immunity? It is supposed to be a narrow protection, a relatively narrow protection. It's supposed to be very specific. Where's the line on police protected services if it includes everything that you are suggesting it includes? Where's the line? Well, I mean, the only point of reference that I think we have to go by is how the cases from this court and the Supreme Court break, and you go down the list. You know, you've got Albert. You've got Green. You've got Castillo. I mean, you've got Hill, Pippin, all these cases that have involved either claims against the board or claims against other public agencies where there has been an attempt to provide security, to protect people against violence, and in every single one of those cases it was found immunity under 4-102. So I don't think the line is that difficult to draw here in this case simply because of the way the plaintiffs presented this case. I mean, the whole thing, when you read the closing arguments in this case and the arguments made in chambers, the arguments made during the jury instructions, and that's the other point, you know, I don't see that you can distance yourself from what the jury instructions were. If we're going to be talking about the general verdict rule and what the verdict could have been based on, it has to have been something that was in one of these issues instructions, and every one of them deals with the question of the adequacy of the security, whether it's the adequacy of the security specifically in the JCCC or whether it's our inability to provide adequate security because you didn't give us enough information. And I do want to touch on that issue of providing information, the 2-210 and 2-107 issue. There is absolutely nothing in the text. I mean, this is a case of question of statutory construction. There is nothing in the text of either of those provisions that suggests that they only apply to situations where you provide full and complete but false information, but they don't apply if you only provide partial information or information that omits important details or, you know, things of that nature. There's nothing in the text to support that interpretation of it at all. But again, going back to the line drawing in Mr. Rastek's point, that if it's any time anybody talks to anybody and what they said leads to some problem, where's the line? If it's inadequate information, any information, where's the line? What is it? Well, if we are going to talk about protecting public entities and we're going to talk about the issue of providing information, there's probably no greater area that would be susceptible to abuse against public entities because you're always going to be able to go back and find something that someone overlooked, failed to communicate, didn't mention along the way, isolate that on that and say, aha, you let something out and therefore 2-107 and 2-210, they don't apply. But in the same vein, we're not supposed to add to the statute. And we all know that the common refrain is that if the legislature wanted to include omissions, they could have included them. They could have said any agency that provides or fails to provide, they didn't. They said the providing of information. Mr. Rancic's position is that we're not complaining about what they provided to CSU. We're complaining about what they didn't tell CSU. I agree. I realize that that is the argument. But I still believe that. But you don't think it's a good argument. I don't. From a statutory construction standpoint, I think when you look at the term providing information, I do think that that fairly encompasses false, incomplete, I mean, what else is it? Well, he's talking about the failure to provide. Right. But that's, and omissions. You know, you didn't give me enough information. All right? Because people are going to act on the information you provide, and that's what I think the purpose, what's the intent behind the statute, is circumstances where people are going to rely on the information that a governmental entity is providing. And so if the information is insufficient, which I think could happen with a public entity, okay? I'm not speaking about the board right now. Maybe other public entities. But certainly you could have public entities that don't always provide all the information that they should and that we need as citizens to rely upon. Are we going to be able to swear on that every time? I think the legislature's intent was to encompass within that the failure to provide complete information as well as false information you have to provide. It should be reflected with the phrase providing or failure to provide, which they didn't do here. They could have written it that way. I don't disagree with you on that. I don't want to be a dead horse, but, I mean, now we're in the statutory construction and we're supposed to construe the statute narrowly because it's in derogation of the patent law. I agree. But I do think, I don't think you need to reach the 2107 or the 2-210 issue in this case. I really think that from the standpoint of 4-102 and DeSmet where that was information that communicated to me and that's another situation where it can occur. We're talking here specifically about a law enforcement situation. So you're not invoking 107 or 110? That's certainly my alternative argument. I just don't think you need to reach it in this case. I think it's dispositive under 4-102. I did want to touch on the fact briefly at the end here about the special interrogatories because there was, they were refused. They are part of the post-trial motion. They were submitted to the judge at the same time the post-trial motion was submitted. I think it's more than adequate to have apprised the judge that we felt that that was in error and to ask him to reconsider and that is the basic point of a post-trial motion is to give the judge another chance to correct an error before it has to go up on appeal. And we gave him that chance. The, I do think the interrogatory would have controlled and I know this court has a pretty recent decision about special interrogatories involving the tort immunity act and whether they should track the language of the immunity or not. I think, is that Burns, I think was the name of the case? But, and that was... Which of the two that you cited in your brief that you believe would have controlled? I'm sorry? Which of the two you believe would have controlled? Definitely special interrogatory number two. Definitely number two. Number two. I mean, that one tracks the language of 4-102 to the letter. Were they providing police protection services? Did they fail to provide adequate protection? Did they fail to prevent a crime? Did they fail to deter or solve the crime or apprehend criminals? And if the jury answered yes to that, what would you know? You would know that everything that the plaintiff was attributing their injury to was derived from the failure to do this. Everything? No, that's, I mean, that's, I mean, to me, I really think that's the basic theory of the case. The whole theory of the case is that Tyrone wouldn't have been killed if he'd had better police protection. Related to the issue of failing to communicate, though. Well, I. So I wouldn't answer that part of the question. If that's what the jury based their verdict on, then it seems as though the general verdict was same. Well, I think that because plaintiff's theory was we were unable to, you did not provide adequate police protection because the school didn't give you adequate information, traces back. I mean, it traces right back to the question of the adequacy of the security. I mean, that's what the failure to provide the information could only relate to, is some way of providing better or different security. There's nothing else that the failure to communicate that information could relate to. It all revolves around the testimony of the CSU police officers. This was important to us. We would have wanted to know this. Why? Because it affects security. Maybe they would have canceled the event if our board had known about it. But I go back to my point. Nobody ever said exactly what they would have done differently if they had known. Would they have canceled the event? No, there was no testimony to that effect. Well, they did say they would have changed their level of security, which counsel argued that would have been an increase. Actually, I don't believe that's accurate. I don't think there's testimony from either Sergeant Murray. Counsel misspoke. We'll verify that. Yeah, I would take a close look at that, but I don't think there was any testimony by any of the CSU police officers that said we would have elevated or changed our level of security. They said it was important. They would have talked about it. They would have considered it. But, in fact, Lieutenant Robinson said, I'm not sure we would have done anything different. So unless the court has any other questions. Thank you. Thank you very much for your time. Thank you, Bill. This was a very well-read, very well-argued, really interesting, complicated question, and we will take it under advisement. Thank you.